[Crim. No. 2066. In Bank.—September 20, 1917.]

In the Matter of the Application of ANDREW J. BRITT for a Writ of Habeas Corpus.

PARENT AND CHILD—CUSTODY OF MINOR—WHEN FATHER NOT ENTITLED.—Where it is unlikely that upon application for guardianship any court would pronounce a parent suitable for the control, education, and rearing of his child of tender years, and it is shown that a court of proper jurisdiction in another state has deprived him of the custody of the child in a suit for divorce, also that his fitness has been denied in judicial proceedings more than once, and that for a long time he showed no desire for the society of the child, and it also appears that he withheld his assistance from the child when a really affectionate parent would have offered it, and the child is in the custody of a maternal grandaunt, a woman of means, who has surrounded the child with the comforts and the good moral influence of an excellent home, under these special circumstances a court will not on *habeas corpus* instituted by the father disturb the custody of the child.

CLXXVI Cal.—12

APPLICATION for Writ of Habeas Corpus.

The facts are stated in the opinion of the court.

Cecil H. Phillips, for Petitioner.

McNabb & Hodge, for Respondent.

MELVIN, J.—Andrew J. Britt, father of Ruby Britt, a minor child of the age of seven years, sought to obtain the custody of his daughter, who is now in the care of her grand-aunt, Amanda Starkweather, a resident of this state. Upon his petition a writ of *habeas corpus* was issued and the matter has been heard upon record evidence, stipulated facts, and depositions.

It appears that Britt and his wife and child resided at Kansas City, Missouri, where he was employed as a night watchman and a painter. On the 7th of July, 1910, Mrs. Britt, who had been in failing health, went to Colorado in the hope that the change would benefit her. Andrew Britt, according to his own testimony, accompanied her to the train, having given her the money necessary for the journey, and he kissed her good-bye. Within a very few weeks after her departure he filed a verified complaint charging her with adultery and also with deserting him on the 7th of July, 1910, the *day upon which she had departed with his full approbation.* We cite this incident as one of the indices to the character of Andrew Britt which this record furnishes. Mrs. Britt did not know of the existence of this complaint until September, 1911, as she deposed in her verified answer and cross-bill.

Notwithstanding the filing of his complaint, shortly after it was filed and very soon after Mrs. Britt's return to Kansas City, Missouri, a reconciliation took place and the Britts lived together for some months, she being still ignorant of the pendency of the action for divorce. Britt, in his testimony before our commissioner, places the time during which they then lived together at a year or "a little over." He then went to California, where he remained for six months. During that time he contributed nothing to the support of the child or the mother, although he says he sent thirty dollars for taxes and interest due on his property and the mortgage thereon.

During his absence Mrs. Britt filed an answer and cross-bill in the action for divorce and on January 8, 1912, her prayer was granted and the custody of the minor child was awarded to her. She was also given alimony in the sum of eight hundred dollars—an obligation subsequently met by Britt by the transfer to her of his interest in the equity in their home. The decree of divorce was given by the circuit court of Jackson County, Missouri.

After his sojourn in California petitioner returned to Kansas City but did not contribute to the support of his child, because, as he said, he was not given opportunity to see her whenever he wanted to do so. The testimony of Mrs. Martin, the child's grandmother, shows that at that time Mrs. Britt was having a hard struggle to support herself, and Mrs. Martin, although a poor woman, was aiding her in the care of the little girl. Of course, petitioner was not legally bound to care for the child at that time, but his conduct in the premises indicates that his feeling for the infant was not warmly paternal.

After some months of struggle Mrs. Britt, who had become a victim of tuberculosis, went to Colorado Springs. Britt paid her fare and shortly after her departure with their child he followed her, with the understanding that they were to remarry. Not obtaining work in Colorado Springs, Britt went to Los Angeles, and after securing employment there sent for his former wife, who went to Los Angeles, where they lived ostensibly as man and wife for two and a half months. This relation, which Britt characterizes as "a try-out proposition," was severed because he objected to Mrs. Britt's association with some woman who was their neighbor and Mrs. Britt refused to give up the friendship. He left her without money in a strange city, far from her friends, and although he declares that she refused his offers of money made a few days later when he returned to their apartment, which she still occupied, the fact remains that Mrs. Starkweather, Mrs. Britt's aunt, who is the respondent here, paid the expenses of the journey to Kansas City, Kansas (just over the state line from Kansas City, Missouri), where Mrs. Martin resided. Mrs. Britt, who had visited for a short time with Mrs. Starkweather at San Bernardino, reached Kansas City, Kansas, in April, 1913. She went to work but left the child with Mrs. Martin, who had the little one until Mrs. Starkweather took

Ruby to California under circumstances which we shall presently discuss.

Mrs. Britt died in April, 1914. Two weeks before that time Mr. Britt gave the grandmother ten dollars and promised her ten dollars a month for the support of the child. According to Mrs. Martin's testimony his entire subsequent contributions for care and clothing for Ruby amounted to not more than thirty or forty dollars. He asserts that he gave more money than that, but admits that his payments ceased in June, 1914, because he was not given full opportunity to visit his daughter.

Mrs. Martin, who, according to her testimony, had become desperately poor by reason of the loss of the support formerly afforded her by her husband and her son, both of whom had died, began proceedings in the juvenile court of Wyandotte County, Kansas, alleging in her affidavit that Ruby Britt was an abandoned child, her mother being dead and her father "having practically abandoned her for several years." A hearing was had and Harriet B. Cole was appointed guardian of the person of the little girl. This order was made on June 28, 1915. Ten days later Andrew J. Britt applied for a hearing in the matter on the ground of falsity in the averments of Mrs. Martin's application and on the ground that he was entitled to the custody of the child, Ruby Britt. After citation to the child two hearings were had and the court overruled the motion with costs taxed against Britt.

In October, 1915, Amanda E. Starkweather applied for an order of adoption, and, the guardian consenting, the probate court of Wyandotte County, Kansas, declared Ruby Britt duly adopted by Mrs. Starkweather. Immediately after this order was made Mrs. Starkweather brought Ruby to California and since that time, as the evidence abundantly shows, has given her all the care, affection, and nurture that a mother might bestow. The little girl has been somewhat afflicted, suffering at times with a weakness of the ankles, requiring that braces be worn on them. Mrs. Starkweather is a woman of means and has surrounded the child with the comforts as well as the good moral influences of an excellent home.

Petitioner learned of the adoption proceedings soon after the order was made but he took no steps to get possession of his child and made no demand upon Mrs. Starkweather until he came to California about a year later. He testifies that

the delay was due to the fact that he was saving money for the fight for the recovery of possession of his child.

It appears without contradiction that the little girl has a great love for Mrs. Starkweather and a distinct aversion to petitioner.

We have thus recited the facts, perhaps at unnecessary length, for the purpose of indicating that this is a controversy which should have been settled in a guardianship proceeding or on an application for adoption of the minor. It is conceded by counsel for respondent that the order of the probate court in Kansas was made without jurisdiction, because Mrs. Starkweather was not a resident of that state and could not under its laws adopt the minor. But it does not follow that upon proceedings under a writ of *habeas corpus* this court will award the custody of the child to the father. Where, under appropriate proceedings, a parent has been declared a fit and proper custodian of the person of a child, this court has been inflexible in the enforcement of the parental right and has never allowed its judgments to be swayed by the poverty of the parent as compared with the affluence of the person from whom the child is demanded. Likewise, the court has frequently ignored the affection of the child for the custodian and the manifest dislike of the minor for the parent. But in every instance we have done this under the plain mandate of our guardianship laws. We might cite many authorities upon this point, but the rule both in guardianship proceedings and in those taken under writs of *habeas corpus* is well illustrated by such cases as *Guardianship of Mathews*, 169 Cal. 26, [145 Pac. 503], *Guardianship of Mathews*, 174 Cal. 679, [164 Pac. 8], and *In re Mathews, ante*, p. 156, [167 Pac. 873]. But here we are not impelled to put into operation the decree of a court establishing the fitness of a. parent for the custody and control of a child. It is very unlikely that any court, upon application for letters of guardianship, would pronounce this petitioner, in view of such evidence as that which has been presented to this court, a suitable person for the control, education, and rearing of the little girl, his daughter, Ruby Britt. The court of proper jurisdiction in Missouri deprived him of the custody of his child in the suit for divorce. The juvenile court in Kansas, to which he applied for the further hearing in the guardianship matter, refused to set aside its order previously given and made, such

refusal following two hearings held after the case was reopened. Every time his fitness has been the subject of judicial inquiry the court has determined that he was not the proper person to possess and control his child. While he may be able to give the child the necessaries of life, he declares his purpose to be, if given custody of her, to place her with a man and his wife whose duties call them away from home every night until a late hour. He purposes to dwell in the same house, but his duties as a janitor would take him away from the child frequently at night. The words of the late Chief Justice Beatty, in denying a petition for a writ in a case similar to this (*In re Gates,* 95 Cal. 461, [30 Pac. 596]), are entirely appropriate here. He said: "In view of the special circumstances of the case, I do not feel called upon to make any coercive order by which the mere legal right of the petitioner may be enforced against the child's manifest inclination and reasonable choice to remain where she is." The same doctrine has been announced by the district court of appeal (*In the Matter of the Application of Bell,* 28 Cal. App. 547, [153 Pac. 240]). These cases are to be carefully distinguished from those in which, after hearings held for the very purpose of determining the fitness or unfitness of a parent, courts have awarded the custody of a child. They are also quite different from those cases in which the demand for the possession of a child is supported by a showing of ability, willingness, and sincere effort to perform parental duty. In the matter before us it appears that the petitioner's fitness has been denied in judicial proceedings more than once; that for a long time he showed no desire for the society of his child; that he withheld from her assistance when a really affectionate parent would have offered it; and that after Mrs. Starkweather, doubtless in the utmost good faith and in the full belief that she was within the sanction of the law, had taken the child into her household, he waited long months before he asserted his supposed right as a parent to provide a home for his little daughter. These are some of the "special circumstances," which operate in favor of our refusal to make the "coercive order" which petitioner seeks.

The prayer of the petitioner is denied and the writ is discharged.

Sloss, J., Henshaw, J., Shaw, J., Lawlor, J., and Angellotti, C. J., concurred.